**THE STATE OF NEW HAMPSHIRE**

**SUPREME COURT**

**In Case No. 2016-0429, <u>State of New Hampshire v. Charles Normil</u>, the court on January 17, 2019, issued the following order:**

Having considered the briefs and oral arguments of the parties, the court concludes that a formal written opinion is unnecessary in this case. Following a jury trial in Superior Court (<u>Abramson</u>, J.), the defendant, Charles Normil, was convicted on four counts of aggravated felonious sexual assault (AFSA), <u>see</u> RSA 632-A:2 (Supp. 2018), one count of attempted AFSA, <u>see</u> RSA 632-A:2; RSA 629:1 (2016), two counts of first degree assault, <u>see</u> RSA 631:1 (Supp. 2018), two counts of second degree assault, <u>see</u> RSA 631:2 (Supp. 2018), one count of burglary, <u>see</u> RSA 635:1 (2016), one count of conspiracy to commit burglary, <u>see</u> RSA 635:1, I; RSA 629:3 (2016), and one count of falsifying physical evidence, <u>see</u> RSA 641:6 (2016). On appeal, the defendant argues that the trial court erred by admitting a witness's testimony at trial regarding the defendant's request that the witness retain and destroy evidence. The defendant challenges the trial court's rulings that: (1) the evidence was admissible because the defendant failed to include it in a pretrial motion <u>in limine</u>; and (2) it was admissible as consciousness of guilt evidence. We affirm.

The jury could have found the following facts. The defendant's convictions arise out of events that occurred on November 24, 2012, when he and his co-conspirator, Lamontagne, were driving around the Bedford area using illicit drugs and the defendant informed Lamontagne that he intended to commit a burglary. Lamontagne stopped the car and the defendant put on a mask and gloves that he retrieved from the car. Lamontagne also put on gloves and the two men approached the unoccupied home of E.Q. and his wife, S.V. Lamontagne helped the defendant gain access to the house and then returned to his car. As soon as Lamontagne got into his car, he saw another car pull into the driveway. He alerted the defendant by calling his cell phone and then drove around the neighborhood waiting for the defendant.

While the defendant was inside the house, E.Q. and S.V. returned to their residence where they discovered the defendant, who demanded that they provide him with the location of the safe or lockbox. When they told the defendant that there was no safe or lockbox, the defendant took their cell phones and told them to lie on the floor. The defendant then beat E.Q., stabbing him in the head with a screwdriver, until E.Q. lost consciousness. The defendant then tied up S.V. and assaulted her, physically and sexually.

The defendant subsequently took E.Q.'s wallet, both victims' watches and their wedding bands, and fled the residence.

After waiting for approximately 15 to 20 minutes, Lamontagne picked up the defendant as he came out of the woods near the victims' residence. When the defendant entered the car, his gloves were bloody and he described in detail the nature and extent of his assaults of both victims.[1] The defendant and Lamontagne then began destroying or concealing the evidence of their crimes. The defendant threw his bloody gloves out the car window in Amherst. He then wiped any blood off of the car with socks that he found in the car, and threw those socks over a guardrail in Amherst. They went back to Lamontagne's house where the defendant took off his bloody clothes, washed them with bleach, and put them in a black plastic bag. Lamontagne and the defendant then drove back to Amherst to dispose of the clothes. On one of the following nights, Lamontagne and the defendant returned to the Amherst location, retrieved the clothing, and drove to two different locations in Milford where the defendant disposed of the evidence.

A few months later, the police obtained information linking Lamontagne and the defendant to the Bedford home invasion. They questioned Lamontagne, who gave an account of what happened that night in Bedford. Lamontagne also brought the police to one location where they found E.Q's wallet, and a second location in Milford where they found a plastic bag with bleached clothing. Based, in part, upon this evidence, the State indicted the defendant for the assaults and burglary committed in Bedford and for falsifying evidence.

Prior to trial, the defendant filed a motion in limine to exclude letters and testimony by Lamontagne and another witness, Leblanc, regarding bags that allegedly contained items from other burglaries or thefts unrelated to this case. The trial court granted the motion, finding that "[i]t appears that at no point did the bags contain items connected with the charged crimes," and they do not have probative value.

At trial, the State sought to introduce evidence through another witness, Faucher, proffering that she would testify that she received a suitcase from the defendant's mother, who told her that it belonged to the defendant, and that he wanted Faucher to hang onto it. The State further proffered that she would testify that she placed the suitcase in a closet and then received a letter from the defendant a few weeks later telling her to dispose of it because the police were looking to raid the house. The State also proffered that Faucher would

---

[1] Although E.Q. and S.V. survived the assault, they both suffered debilitating injuries. The nature and extent of the vicious assaults and the severe injuries suffered by the victims were sufficient to support each of the defendant's convictions, but those facts are not germane to the issues raised in this appeal and, thus, are not described in this order.

testify that she disposed of the suitcase and never opened it or observed its contents. The defendant challenged the admissibility of this evidence. The trial court ruled that Faucher's testimony was admissible because it was not included in the motion in limine filed prior to trial and it was "offered to show consciousness of guilt."

On appeal, the defendant argues that the trial court erred when it admitted Faucher's testimony regarding the suitcase because New Hampshire Rule of Evidence 404(b) prohibits the admission of other acts evidence unless it is relevant for a non-propensity purpose. He contends that the trial court committed legal error when it: (1) overruled his "Rule 404(b) objection on the ground that he did not seek to exclude it in a pretrial motion in limine"; and (2) "ruled that the evidence was admissible because it showed [the defendant's] consciousness of guilt in 'a case.'"

The State disputes that admission of this testimony was error, but argues that even if it were, any error was harmless beyond a reasonable doubt. The defendant counters that the State failed to sufficiently brief the issue of harmless error regarding the character of the erroneously admitted evidence itself, and, therefore, we should decline to consider it.

Although the State does not explicitly discuss the character of the evidence in the context of its harmless error analysis, the State assesses the inconsequential nature of this evidence when it addresses its prejudice as it relates to the Rule 404(b) analysis. Thus, for the purposes of this appeal, we assume, without deciding, that admitting Faucher's testimony was erroneous, and we agree with the State that any error was harmless beyond a reasonable doubt. See State v. Cooper, 168 N.H. 161, 165 (2015); State v. Ramsey, 166 N.H. 45, 47-48 (2014) (applying harmless error review to admission of evidence assumed to be in violation of New Hampshire Rules of Evidence and State and Federal Confrontation Clauses).

> The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence, and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.

State v. Bazinet, 170 N.H. 680, 686 (2018) (quotation omitted).

To establish that an error was harmless, the State must prove beyond a reasonable doubt that the error did not affect the verdict. Id. at 687. This standard applies to both the erroneous admission and exclusion of evidence. Id. An error may be harmless beyond a reasonable doubt if the other evidence of the defendant's guilt is of an overwhelming nature, quantity, or weight, and

3

if the evidence that was improperly admitted or excluded is merely cumulative or inconsequential in relation to the strength of the State's evidence of guilt. Id. In making this determination, we consider the other evidence presented at trial as well as the character of the erroneously admitted evidence itself. Id. Because Faucher's testimony could have aided the jury in convicting the defendant on all 12 counts, we review each one to determine whether there was overwhelming alternative evidence of guilt.

The defendant was convicted on four counts of AFSA, one count of attempted AFSA, two counts of first degree assault, two counts of second degree assault, one count of burglary, one count of conspiracy to commit burglary, and one count of falsifying physical evidence. In this case, evidence of the defendant's guilt for each of the 12 convictions was overwhelming and Faucher's testimony regarding the suitcase was merely cumulative in relation to the other evidence introduced at trial.

To convict the defendant on the four counts of AFSA, the State had to prove beyond a reasonable doubt that the defendant knowingly engaged in sexual penetration of the victim when he, in two instances, "overc[ame] the victim through the actual application of physical force, physical violence or superior physical strength," RSA 632-A:2, I(a), and in another two instances, "coerce[d] the victim to submit by threatening to use physical violence or superior physical strength on the victim, and the victim believe[d] that the actor ha[d] the present ability to execute these threats," RSA 632-A:2, I(c). To convict the defendant of attempted AFSA, the State had to prove beyond a reasonable doubt that the defendant: (1) acted purposely; (2) intended the crime of AFSA be committed; and (3) took a substantial step toward the commission of the crime. See RSA 632-A:2; RSA 629:1, I.

To convict the defendant on the two counts of first degree assault, the State had to prove beyond a reasonable doubt that he knowingly caused bodily injury to another by means of a deadly weapon. See RSA 631:1, I(b). To convict the defendant on the two counts of second degree assault, the State had to prove beyond a reasonable doubt that the defendant knowingly caused serious bodily injury to another. See RSA 631:2, I.

The alternative evidence of the defendant's guilt of these crimes was overwhelming. The other evidence included, inter alia, the testimony of Lamontagne, an inmate housed in the same jail facility as the defendant prior to trial, E.Q., medical professionals, and police officers. Lamontagne's testimony outlined how the home invasion occurred on November 24. It also included testimony that, after committing the burglary, the defendant returned to the car with bloody gloves and the defendant described specific details of the physical and sexual assaults of the victims. Other evidence included testimony from an inmate who testified that the defendant made incriminating statements to him, such as how the defendant had participated in a home

4

invasion and stabbed "the guy" with a screwdriver. In addition, E.Q.'s testimony, together with the testimony of medical professionals and police officers, corroborated the testimony of both Lamontagne and the inmate regarding the events of the home invasion and the attempted destruction of evidence, and further demonstrated the extensive injuries to both E.Q. and S.V.

To convict the defendant of burglary, the jury was instructed that the State had to prove beyond a reasonable doubt that the defendant, acting purposely, entered a building or occupied structure at night with the purpose to commit the crime of theft inside, and he was not licensed or privileged to enter the occupied structure. See RSA 635:1, II. To convict the defendant of conspiracy to commit burglary, the jury was instructed that the State had to prove beyond a reasonable doubt that the defendant, with the purpose of committing the crime of burglary, agreed with another person to commit the underlying crime of burglary, and during the existence of this conspiracy, one of the members committed an overt act in furtherance of the conspiracy. See RSA 635: I; RSA 629:3, I.

The alternative evidence of guilt of these crimes was also overwhelming. In addition to the evidence previously discussed, the State presented testimony by an FBI agent from the Bureau's cellular analysis survey team that placed the defendant and Lamontagne's cell phones near the victims' home on November 24, 2012, and near other relevant locations, including where the police recovered E.Q.'s wallet. As further evidence of the defendant's whereabouts, Lamontagne's landlord testified that Lamontagne and the defendant had left her home around 9:00 p.m. that night, returned shortly after 10:15 p.m., and then left again.

Other alternative evidence included testimony from Lamontagne and police officers. Lamontagne testified that he had been driving with the defendant when the defendant announced that he intended to commit a burglary and decided to enter E.Q. and S.V.'s home. Lamontagne also testified that he helped the defendant enter the home before leaving him and returning approximately 20 minutes later to pick him up and then help him conceal evidence of the home invasion. The police testified that during their investigation of the scene of the home invasion, they discovered a footprint that was consistent with the type of footwear that Lamontagne testified the defendant wore the night of the burglary. In addition, an officer testified that E.Q. reported a missing wallet and watch. Lamontagne testified that after the defendant fled E.Q. and S.V.'s home he possessed several items, including wallets and watches. Lamontagne's testimony was corroborated by testimony from police officers who described Lamontagne bringing them to a location where they retrieved E.Q.'s wallet.

To convict the defendant of falsifying physical evidence, the jury was instructed that the State had to prove beyond a reasonable doubt that the defendant, acting in concert with and aided by another, believing that an official investigation was about to be instituted, and with a purpose to impair the verity or availability of the physical evidence in the investigation, concealed physical evidence. See RSA 641:6.

The alternative evidence of guilt for this crime was overwhelming. It included testimony by Lamontagne that after the burglary, he and the defendant returned to Lamontagne's home, where the defendant took off his clothes and washed them with bleach. Lamontagne also testified that they put the clothes in a bag and disposed of the bag in Amherst. A few days later, they retrieved the clothing, divided it into different bags, and then disposed of the evidence in different locations in Milford. Officers testified that they recovered a bag in Milford containing clothing, including pants that appeared to have a bleach stain.

In sum, Faucher's testimony was inconsequential in light of the other evidence introduced at trial. Its impact was minimal considering the ample evidence placing the defendant at the victims' home on the night of the home invasion and demonstrating that he sought to conceal or destroy evidence related to this crime. In addition to the evidence discussed above, other evidence demonstrating the defendant's consciousness of guilt included testimony that he had discussed his whereabouts with a witness in advance of her second interview with the police because the detectives were asking her about the defendant's activities on the night of the home invasion. It also included testimony from a witness who had known the defendant for years, who testified that around December 12th, the defendant appeared at her home and burned a duffle bag filled with bloody clothes and shoes. The witness also testified that the defendant gave her a set of watches he claimed were valued at ten to twenty thousand dollars. The witness explained that the defendant suggested that she should tell the police that he had been with her on the night of the burglary.

The defendant maintains that the trial court's ruling was prejudicial because it placed him in a "'no-win' situation." He contends that the "only way to explain his instruction to Faucher to dispose of the suitcase was to introduce evidence that he committed a different burglary in Massachusetts," which would have been highly prejudicial evidence in and of itself. While we agree that the defendant had a limited recourse to challenge the relevance of the testimony, we conclude that it did not prejudice his defense. The jury had no knowledge of the contents of the suitcase and there was no evidence submitted at trial to demonstrate or imply that the defendant had committed other unrelated crimes. Any assumption that the jury may have made concerning whether the suitcase contained evidence of the charged crimes would have been cumulative to the other evidence presented to the jury that

6

was probative of the defendant's consciousness of guilt and, specifically, the defendant's determination to destroy evidence.

There was ample alternative evidence to establish the defendant's guilt of each of the crimes of which he was convicted. Therefore, given the overwhelming nature of the alternative evidence of the defendant's guilt, and the cumulative and inconsequential nature of Faucher's testimony regarding the suitcase in relation to the strength of the State's evidence of guilt, we conclude, beyond a reasonable doubt, that the testimony did not affect the verdict. Thus, any error was harmless.

Finally, any issues that the defendant raised in his notice of appeal, but did not brief, are deemed waived. See Bazinet, 170 N.H. at 688.

Affirmed.

LYNN, C.J., and HICKS, BASSETT, HANTZ MARCONI, and DONOVAN, JJ., concurred.

**Eileen Fox,**
**Clerk**

7